

# Business Deposit Account Agreement

## Terms and Conditions of Your New Account

Charter One
A division of RBS Citizens, N.A.

**Charter One®**



EXHIBIT A

## Table of Contents

| Section | Page Number |
|---|---|
| A. Establishing an Account | 1 |
| B. General Terms and Conditions | 3 |
| C. Business ATM Card and Business Debit Card Transactions | 17 |
| D. Funds Availability | 20 |

## Welcome to Charter One

We are delighted that you have chosen Charter One for your account today and we look forward to serving you.

This Business Deposit Account Agreement (Agreement) contains the terms and conditions for each business deposit account you have opened with us. This Agreement replaces all previous deposit account agreements. Please read this Agreement carefully — it describes your rights and responsibilities regarding your account. Your account is also governed by the Business Deposit Account Fees and Features guide (Fees and Features guide), which discloses the interest rate and fees applicable to your account and other important information about your account, including minimum balance requirements. The Fees and Features guide is part of this Agreement, and this Agreement and the Fees and Features guide may be amended by us from time to time. By signing an account signature card or maintaining an account with us, you agree to the terms and conditions of this Agreement and the Fees and Features guide. Your account is also subject to federal law and, to the extent not preempted by federal law, the law of the state where we open your account, or, if we transfer your account to another location, where we currently maintain your account (*Applicable Law*).

In this Agreement, the words you and your mean the person, partnership, corporation, association, limited liability company or other business entity that maintains an account with us. The words we, our and us mean RBS Citizens, N.A. Charter One is a division of RBS Citizens, N.A. Also, for purposes of this Agreement, the term business day refers to every day except Saturdays, Sundays, and federal holidays when we are closed. Finally, references to customers of a particular state or region mean customers whose accounts we opened in that particular state or region, or, if we transfer an account to another location, customers whose accounts we currently maintain in that state or region.

Please review the entire Agreement and the Fees and Features guide and keep them for future reference.

At Charter One, all of our business deposit accounts are designed to provide you with exceptional value. You can choose the account that is right for you and enjoy features that make your banking simpler and more financially rewarding. Whatever way you choose to bank with us, we're always here to serve you.

If you have any questions about this Agreement, the Fees and Features guide or your account, or would like further information about our products and services, please visit our website (www.charterone.com) or any of our branch offices, or contact us 24 hours a day, 7 days a week at 1-866-262-4249. You agree that we may monitor or record any telephone conversation you have with us so that we may enhance security, improve customer service or train our staff.

Thank you for your important relationship with us. We look forward to serving you.

© 2009, Citizens Financial Group, Inc

## A. ESTABLISHING AN ACCOUNT

**1. Scope of Agreement.** This Agreement applies only to business deposit accounts established with us. Business deposit accounts are those accounts established by a partnership, corporation, association, limited liability company or other business entity operated on a for-profit basis; a corporation or association operated on a not-for-profit basis; a governmental entity; and an individual that intends to use the account for carrying on a business or trade.

**2. Eligibility.** You may open and maintain an account with us if (a) we have received and approved all account opening documentation we may require, (b) your account has been appropriately funded, and (c) you have satisfied any other requirements we may have. If you open a retirement account with us, we are the custodian of any simplified employer pension plan (SEP) and the custodian or directed trustee of any Qualified Plan account. We are also the prototype sponsor of any SEP or Qualified Plan.

**3. Availability.** We offer a wide range of checking, savings, money market and certificate of deposit (CD) accounts, all designed to meet your financial goals. From time to time, we may create new types of accounts to serve your changing needs. Also, as our products and services change, we may discontinue certain accounts, and we reserve the right not to offer certain accounts without notice at any time. Discontinued products may not be reflected in our most current disclosures.

**4. Documentation, Identification and Information.** To help the government fight the funding of terrorism and money laundering activities, Applicable Law requires all financial institutions to obtain, verify, and record information that identifies each person who opens an account. Accordingly, you may establish an account with us by signing our signature card and providing us with any other account documentation that we may require from time to time. To avoid possible fraud or other problems with your account, all documentation you provide to us in connection with establishing your account must be in a form satisfactory to us.

We reserve the right to approve any and all documentation, such as checks or other items you use with your account. You agree that (a) we are not liable to you and (b) you will indemnify and hold us harmless from any and all losses, liabilities, claims, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees and litigation costs) of any kind that we may incur resulting from your use of checks obtained from a third-party vendor and not through us or if you print your own checks. When we use the word check in this Agreement we mean checks or other items, such as drafts or electronic images presented to us for payment by another financial institution. Also, when we use the word Losses in this Agreement we mean losses, liabilities, claims, fines, penalties, fees, costs and expenses (including, without limitation, attorneys' fees and litigation costs) of any kind.

We may from time to time request additional information from you to protect your account and our systems from fraud or other problems. This information may include new specimen signatures and other information that we must obtain under Applicable Law, including laws designed to stop the funding of terrorism and money laundering activities. You agree to assist us by promptly complying with any such request. You also agree to hold us harmless for refusing to pay or release funds or to take any other action relating to your account where the refusal is based on your failure to provide the signatures or documentation requested by us from time to time.

**5. Signature Card, Resolutions and Other Written Authorization.** The classification and form of ownership of your account is designated on the signature card you completed when opening your account. We may rely on this designation for all purposes concerning your account. You and each person who signs the signature card, any resolution or any other written authorization concerning your account, represents to and agrees with us that: (a) you have taken all actions necessary to open and maintain the account, (b) all resolutions or other authorizations given to us by or on behalf of you are true, accurate and complete in all respects, (c) all assumed or fictitious names used by you have been duly registered or filed with the applicable governmental authorities, and (d) each person whose name is written or printed on the signature card, any resolution or any other written authorization concerning your account has complete authority to bind you in all transactions involving your account.

You agree to notify us promptly in writing of any change in your form of organization or ownership or in the authority of any person with respect to your account or any transactions relating to it. We reserve the right to require you to give separate written authorization telling us who is authorized to act on your behalf. We may conclusively rely upon written instructions from any of your officers. We are also authorized to follow the directions of a person having actual, implied or apparent authority to act on your behalf until we receive written notice that such authority has been terminated and we have had a reasonable time to act upon that notice. You agree to indemnify, defend and hold us harmless from and against any and all Losses or other harm arising from any action we have taken or failed to take in any way relating to any resolution, written authorization or directions provided to us by you, any of your officers or any other person having actual, implied or apparent authority to act on your behalf.

We are not required to recognize any resolution, written authorization and any other written instructions that are not on a form provided by us.

**6. Power of Attorney.** If you have established a business deposit account with us as an individual for carrying on a business or trade, we may, in our sole discretion, permit any person to whom you have granted a power of attorney to access and otherwise transact business on your account until such time as we receive and have had a reasonable opportunity to act on written notice that the power of attorney has been revoked. You agree to provide us with documentation that is in a form satisfactory to us

unless Applicable Law provides otherwise, and to hold us harmless from and against any actions we have taken or your attorney-in-fact has taken regarding your account prior to the revocation of such power. Subject to Applicable Law, we may, in our sole discretion, refuse to honor any power of attorney. We have no duty to monitor or ensure that the acts of any attorney in-fact are for your use or benefit or are otherwise permissible under Applicable Law. We will not be liable if any attorney-infact exceeds his or her powers or does not comply with Applicable Law.

**7. Authorized Signers.** The authorized signers for your account are those persons whose signatures appear on your signature card or on any resolution or other written authorization received by us. For the payment of funds and for other purposes relating to your account, we are authorized to recognize those signatures, but we will not be liable to you for refusing to honor a check or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is not genuine. If the signature card is not returned to us, you agree that we will not be liable to you for honoring checks or other signed instructions if we believe in good faith that the signature appearing on such checks or instructions is authorized. We do not offer accounts that require two or more signatures. When an account is established, you may indicate to us that you want two or more signatures for checks drawn on your account by designating a specific number of desired signatures on the signature card, a resolution or in a written authorization that is received by us. Any such designation is solely for your convenience and internal control purposes and is not binding on us. Accordingly, you agree that we may pay checks against your account without regard to the number of desired signatures. You also recognize and agree that you may give another person authority over your account by your action or inaction.

## B. GENERAL TERMS AND CONDITIONS

**1. Facsimile Signatures.** We may in our sole discretion allow you to use a facsimile signature on any check drawn on your account. The term facsimile signature refers to any method used by you to sign a check other than your handwritten signature. This term also includes, for example, the use of signature stamps or plates, computer-generated symbols and signatures produced by digital or other electronic means. You authorize us to accept and pay any such check bearing or purporting to bear your facsimile signature as though you had signed your own name to such check, regardless of how the facsimile signature came to be placed on the check. We may pay such check even if the facsimile signature was placed on the check without your authority and regardless to whom it is drawn or made payable. You agree to assume full responsibility for the use of a facsimile signature and for payments made by us in reliance on such a signature on any check presented for payment regardless of who or what affixed your facsimile signature to it. We reserve the right to reject any check that bears or appears to bear a facsimile signature.

**2. Remotely Created Checks.** If you provide your account number to a third party in order to charge your account by means of one or more remotely created checks (that is, checks which do not bear your actual signature, but purport to be drawn with your authorization), you authorize us to pay such checks, even though they do not contain your signature. This provision does not obligate us to honor remotely created checks. We may refuse to honor such checks without cause or prior notice, even if we have previously honored similar checks.

**3. Endorsing Checks.** If you cash or deposit a check, we are legally entitled to a valid and unqualified endorsement from you, and you give us the irrevocable right to place such an endorsement on the check. You agree to reimburse us for our Losses because you fail to endorse a check as exactly drawn or you deposit a check that contains multiple endorsements or a missing or improper endorsement.

You also agree not to give us any check which you have endorsed without recourse or with another similar condition. If you do, we can still place your unqualified endorsement on the check. We can enforce against you any rights that an unqualified endorsement gives us. Unless otherwise required by Applicable Law, we will not be bound by or obligated to comply with any notation or memoranda on a check unless we have agreed to do so in advance and in writing.

We are not required to enforce any restrictive legend you print or write on your checks, such as "void after 90 days" or "not valid over $250.00."

Federal law requires endorsements on deposited checks to be contained on the back of the deposited check within $1^{1/2}$ inches of the trailing edge of the check. The trailing edge is the left side of the check looking at it from the front. The remainder of the deposited check is reserved for endorsements by depository institutions. If a check contains any printing, writing or other material on the back of the check outside the area extending $1^{1/2}$ inches from the trailing edge of the check, that material could cause delays in processing and returning the check. Accordingly, you agree that (a) we are not liable to you and (b) you will indemnify and hold us harmless from and against Losses that we may incur as a result of a late return of a check caused by any printing, writing or other material on the back of any check deposited in or drawn on your account that is outside the area extending $1^{1/2}$ inches from the trailing edge of the check.

**4. Deposits.** Each deposit to your account must be accompanied by a completed deposit slip or other documentation we may require from time to time. You may make a deposit into your account in person at any of our branch offices, by mail, or by any other method we make available, such as at any of our automated teller machines (ATMs) or night depositories. We are not responsible for deposits made by mail, night depository, ATM or other outside depository until we actually record the receipt of such deposits in our books and records.

All deposits to your accounts, regardless of how made, are subject to verification, final payment and our Funds Availability disclosure which can

5

be found in this Agreement. If we receive a deposit on a weekend, federal bank holiday or after our cut-off hour on a business day, the deposit is considered to have been received on our next business day. Our cut-off hours are contained in our Funds Availability disclosure. You agree that our count of the currency and coins in your deposit is correct as to the amount of the deposit. We reserve the right to make adjustments to your account, in our sole discretion, for computation or other errors to your account.

If a check deposited into your account is returned for any reason by the bank on which the check is drawn (meaning, the check is dishonored), we may, in our sole discretion, represent the check for payment. If we choose to do this, you agree to waive your right to receive immediate notice of dishonor. You agree to pay us a fee for any such check that is dishonored, regardless of the reason for dishonor. The amount of this fee is disclosed in the Fees and Features guide.

In our sole discretion and subject to Applicable Law, we may at any time refuse to accept a deposit, limit the amount that may be deposited into your account or return or hold all or any part of a deposit for any reason. You agree to reimburse us for our Losses resulting from you not endorsing a check as drawn, you depositing a check with a missing endorsement, or the return of any deposited check for any reason.

You may not make additional deposits into your CD account before maturity. However, additional deposits are permitted into Add-On SEP and Qualified Plan accounts as well as Variable Rate Savings Qualified Plan accounts.

5. **Courier Services.** If any of your deposits are delivered or retrieved by a third party, we are not responsible for determining the authority of such person or any other person purporting to be your agent. You agree to indemnify, defend and hold us harmless from and against Losses that we may incur or suffer or that may arise out of, result from or relate to the actions or inaction of any person purporting to be your agent retrieving, delivering and/or taking custody of any of your deposits.

6. **Direct Deposits.** You agree that we may reverse any direct deposit that is made to your account without prior notice to you at any time if (a) we credited your account in an incorrect amount, (b) the deposit represents a duplicate credit to your account, (c) you were not entitled to the deposit, or (d) you were not the intended recipient of the deposit.

7. **Withdrawals.** We will not permit withdrawals from your account unless there are sufficient available funds in your account, and you provide us with identification that is in a form satisfactory to us and with any documentation we may require from time to time (for example, a check or deposit slip). You agree to hold us harmless from and against any Losses arising from, or in any way relating to, refusing to pay or release funds where the refusal is based on your failure to provide us with satisfactory identification and documentation.

We may also refuse your request to make a withdrawal from your account under certain circumstances, including, without limitation, where:

- we have received a court order or other legal document prohibiting withdrawal or if Applicable Law prohibits withdrawal;
- there is a dispute concerning your account;
- you owe us money that is due and payable;
- your account is security for a debt;
- you or a person we believe to be your agent requests that we do not permit withdrawals;
- a problem occurs with our equipment;
- limited currency is available at a particular branch office; or
- such action is otherwise required by Applicable Law.

We are required by Applicable Law to reserve the right to require at least 7 calendar days' written notice before you withdraw money from your interest-bearing checking, savings, money market, Variable Rate Savings SEP or Qualified Plan accounts. If, on our request, you do not provide us with such written notice, we may refuse to allow you to withdraw funds from your account, whether by check or other means, during this period, and we will not be liable to you for this refusal. Variable Rate Savings account withdrawals are subject to current regulations of the Internal Revenue Service (IRS) governing such accounts and may also trigger tax penalties and be subject to taxation. Other withdrawal limits include the following:

a. **Savings and Money Market Accounts.** You may make unlimited withdrawals or transfers from your savings and money market accounts to one of your other accounts in person at one of our branch offices or at one of our ATMs if we have issued you a card that can access your account, provided that your other account accepts such transfers. Applicable Law, however, limits your ability to make transfers from your savings and money market accounts to one of your other accounts or to third parties by preauthorized, automatic, personal computer (including online banking or bill payment services) or telephone transfer (including facsimile transmission) to 6 per calendar month for savings accounts and 6 per statement period for money market accounts. None of these transfers may be made by check, card transaction or similar order to third parties from your savings account; 3 such transfers may be made each statement period from your money market account. If you exceed these limits 3 times or more during any 12 consecutive calendar month period on your savings account or during any 12 consecutive statement periods on your money market account, we will, as applicable, transfer the funds in your savings account to a savings account that does not pay interest or transfer the funds in your money market account to a checking account that does not pay interest. We may, however, transfer your funds sooner if you significantly exceed these transfer limits in any one month or statement period, as applicable.

6

7

b. **CD Accounts.** You may make a withdrawal of principal from your CD account before maturity only if we agree at the time you request such a withdrawal. We may assess you an early withdrawal penalty if you withdraw any principal from your CD account prior to its scheduled maturity date. If your CD account has an original maturity of less than one year, the penalty we may impose will equal 90 calendar days' interest on the withdrawn amount. If your CD account has an original maturity of one year or more, the penalty we may impose will equal 180 calendar days' interest on the withdrawn amount. We will, under certain circumstances, waive these early withdrawal penalties in our sole discretion. For any CD that earns an interest rate that may vary from time to time during its term, the interest rate that we will use to calculate the early withdrawal penalty will be the interest rate in effect at the time of the withdrawal. You can withdraw interest credited to your CD account before the maturity of the term of your CD without bank penalty.

c. **SEP and Qualified Plan Accounts.** All withdrawals from your SEP and Qualified Plan accounts are subject to current regulations of the IRS governing such accounts and may also trigger tax penalties and be subject to taxation. You can withdraw interest credited to your SEP CD account before the maturity of the term of your CD without bank penalty. Interest withdrawals are not allowed on Qualified Plans. There may be a fee for outgoing transfers from a SEP or Qualified Plan account as set forth in the Fees and Features guide. Please see your retirement account disclosure statements for other retirement account transaction limitations.

8. **Automatically Renewable CD Accounts.** Your CD account (except Premium Linked CDs) automatically renews at maturity. You may prevent renewal if you withdraw the funds in your CD account at maturity (or within the 10-calendar-day grace period discussed below, if any) or if we receive written notice from you within the 10-calendar-day grace period discussed below, if any. Written notice may be sent to:

> Charter One
> CD Renewal Department
> Operations Center
> One Citizens Drive
> Riverside, RI 02915-3000

If you prevent renewal of your CD account, interest will not accrue after the maturity date of your account.

Each renewal term will be the same as the original term, beginning on the maturity date. We will set the interest rate on your renewing CD account at our discretion, and it may be different from the interest rate that we pay on other CD accounts of the same type, term and amount that are purchased on your maturity date. To determine your rate on renewal, please call the telephone number listed on your maturity notice on or after the maturity date.

8

At maturity, you will have a 10-calendar-day grace period in which you can withdraw funds from your account without penalty.

9. **Premium Linked CD Accounts.** Interest is credited and automatically transferred monthly to the money market account linked to your Premium Linked CD account. Premium Linked CD accounts do not automatically renew. Upon maturity, the entire account balance will be transferred to your linked money market account.

10. **Choice Feature of CD Accounts.** From time to time, we may offer you the "Choice Feature," which is a promotional offer applicable to CD accounts of a specified term. The Choice Feature gives you a one-time option to change the interest rate on your account for the remainder of its term to the rate we offer on new accounts having the same term as the original term of your account at the time you elect to exercise this option. If your account is renewed, you are eligible to retain the Choice Feature as long as the Choice Feature is offered on new accounts of the same type, term and amount at the time of renewal.

11. **Checking Subaccounts.** For regulatory and accounting purposes, your checking account is divided into two subaccounts: a checking subaccount and a savings subaccount. These subaccounts are treated as a single account — your checking account — for purposes of minimum balance requirements, fees and charges and access to your account. If you have a checking account that pays interest, the interest rate applicable to your account is applied to the combined balance of both subaccounts. Please refer to the Fees and Features guide for information about your interest rate. For checking accounts that do not pay interest, neither subaccount pays interest. Your account statement and other records of your account activity will reflect your checking account as a single account and will not reflect the subaccounts or the transfers between the subaccounts described below in any way. Because the savings subaccount is used for internal purposes only, you have no direct access to the savings subaccount.

Whenever your checking subaccount balance exceeds a threshold amount, we may transfer all funds in excess of that amount into the savings subaccount. We set the balance threshold and may change it at any time at our discretion. As your transactions against your checking account reduce the checking subaccount balance below the threshold, we will transfer funds back into the checking subaccount from the savings subaccount. We may make up to 6 transfers from the savings subaccount into the checking subaccount per monthly statement period. Upon the sixth such transfer in a monthly statement period, we will transfer the entire balance of the savings subaccount into the checking subaccount. We may repeat this process each monthly statement period.

Although we currently have no intention of exercising this right, Applicable Law requires us to reserve the right to require at least 7 calendar days' written notice prior to withdrawal or transfer of any funds from the savings subaccount.

9

10

12. **Foreign Items and Other Non-Routine Items.** Some foreign checks, bond coupons and other non-routine items will be accepted for collection only. These items are not governed by our Funds Availability disclosure which can be found in this Agreement. You will receive credit for such items when we receive final credit from the bank on which a particular item is drawn. If and when we receive final credit for an item that we have accepted for collection only, you agree that we may subtract the applicable fee disclosed in the Fees and Features guide from the amount finally credited to us, before we credit your account for the remaining amount. We may in our sole discretion and from time to time make exceptions to this policy. We are not, however, under any obligation to do so, and we will not be liable to you if we do not do so.

13. **Payment of Checks and Other Transactions.** We may pay checks, in-person withdrawals, ATM withdrawals, point-of-sale transactions, or other paper, electronic or types of transactions (Transactions) in any order determined by us, even if (a) paying a particular Transaction results in an insufficient balance in your account to pay one or more other Transactions that otherwise could have been paid out of your account, or (b) using a particular order results in the payment of fewer Transactions or the imposition of additional fees. We may change the order in which we pay Transactions without prior notice to you. You should be aware that the order in which we pay Transactions may increase the overdraft/insufficient available funds fees you have to pay if sufficient funds are not available in your account when a Transaction is processed to your account. We are not liable for such overdrafts. The amount of the overdraft/insufficient available funds fee is disclosed in the Fees and Features guide.

From time to time, a person who is not one of our customers may try to cash a check at one of our branch offices that you have written on your account. If we cash one of your checks for a noncustomer, we are subject to certain risks that we would not otherwise have if the check were deposited at another bank and presented to us through the check collection system. We may charge a noncustomer a fee to cash a check that is written on your account, unless prohibited by Applicable Law. Also, we may impose additional security, identification and other requirements on a noncustomer seeking to cash a check written on your account. You agree that we will not be liable for wrongful dishonor or other claims or charges relating to our refusal to cash a check for a noncustomer, if that person refuses to pay the fee that we may impose or comply with our security procedures or other requirements.

14. **Overdrafts/Insufficient Funds.** We determine from time to time during each business day whether or not your account contains sufficient available funds to pay a Transaction (i.e., a check, in-person withdrawal, ATM withdrawal, point-of-sale transaction, or other paper, electronic or type of transaction). If we determine that your account has insufficient available funds to pay a Transaction, you agree to pay an overdraft/insufficient available funds fee, and we are not required to honor the Transaction and may return or decline it. Alternatively, we may honor the Transaction and create an overdraft in your account and impose an overdraft/insufficient available funds fee for paying the overdraft. We may impose an overdraft/insufficient available funds fee for each such Transaction that we return or pay. As a result, more than one overdraft/insufficient available funds fee may be imposed on you each day, depending upon the number of such Transactions that we return or pay. You are responsible for the full amount of any overdraft and the related overdraft/insufficient available funds fee. You agree to deposit sufficient funds to cover the overdraft and the related overdraft/insufficient available funds fee immediately and you agree that the overdraft and any overdraft/insufficient available funds fee may be repaid out of any subsequent deposit to your account or set off against such deposit, including, without limitation, deposits of Social Security, Supplemental Security Income or other government benefits. You also agree to reimburse us for any Losses we incur in collecting the overdraft from you. We are under no obligation to permit overdrafts. Our honoring of one or more overdrafts does not obligate us to honor any future overdrafts, and you should not rely on us to honor an overdraft even if we have done so in the past. If, however, your account has an overdraft line of credit, Transactions that would create an overdraft on your account may be honored in accordance with our overdraft line of credit agreement with you. Our overdraft line of credit can be used to provide overdraft protection for your checking account. In addition, your money market account may also be used to provide overdraft protection for your checking account, if your money market account has been approved by us for this service.

15. **Set Off of Deposits.** If you owe us or any of our affiliates money, and that money is due, you agree to grant us and our affiliates a security interest in your account and any account you have with our affiliates, and you also agree to grant us the right, on our own behalf and on behalf of our affiliates, to the maximum extent permitted by Applicable Law, to set off the funds in your account and any other account you have with any of our affiliates to pay money owed to us or any of our affiliates, including, without limitation, charges and fees set forth in the Fees and Features guide owed to us. You agree that the security interest you have granted us by this Agreement is consensual and is in addition to our right of set off. We may exercise our rights of set off and security interest without recourse to other collateral, if any, and even if our action causes you to lose interest, have transactions on your account returned, incur an early withdrawal penalty or any other consequence. If we exercise our right to set off, we will notify you to the extent required by Applicable Law. Our right of set off and our security interest may not apply to your account if: (a) your account is a SEP or Qualified Plan, or (b) the right of set off or the granting or exercise of a security interest in your account is prohibited by Applicable Law.

16. **No Exemption from Set Off.** If any funds in your account are exempt from execution, levy, attachment, garnishment, seizure, set off or other equitable process (including, without limitation, any Social

11

Security, Supplemental Security Income, veterans or other federal or state benefits), you agree to waive such exemption to the extent permitted by Applicable Law.

**17. Reimbursement for Losses.** If we take any action to collect your debt or other amounts you owe us under this Agreement or defend ourselves in a lawsuit brought by you where we are the prevailing party, you agree to reimburse us for our Losses, to the extent permitted by Applicable Law. We may charge your account for our Losses without prior notice to you.

**18. Stop Payment Requests.** If you do not want us to pay a check drawn on your account, you have a right to request that we do not pay the check. We will accept a stop payment request from an account owner or any authorized account signer, regardless of which account owner or authorized signer signed the check. Any account owner or authorized signer may cancel a stop payment order.

You can exercise this right by notifying us in person or by writing or calling us. You may generally stop payment on a check drawn on your account, provided that we have not accepted, certified, paid in cash, made final payment on or otherwise become accountable for such check, except to the extent otherwise required by Applicable Law.

Stop payment requests must be timely and describe the check by the exact account number, check number and amount of the check. You must also provide any other information we reasonably request that would assist us in identifying the check (for example, the name of the person the check is made out to and the date of the check). We must be given a reasonable opportunity to act on any stop payment request before it can be considered effective. Your stop payment request will generally be effective when it is processed in your account. If the information you give us is not correct, does not reasonably describe the check or is not provided timely so as to give us a reasonable opportunity to act on your request, we are not responsible if we are not able to stop payment on the check.

Both written and oral stop payment requests are valid for 6 months, unless you rescind your request in writing before the expiration of the 6-month period. You may also renew your stop payment request by notifying us in person, or by writing or calling us before the expiration of the 6-month period. We will not inform you when a stop payment order is about to expire. If you do not timely renew your stop payment request and the check is presented to us for payment, we may pay it without any liability to you. You may send written stop payment requests to any of our branch offices.

Stop payment requests may not be issued on bank checks (for example, cashier's checks, official checks or money orders). We may, however, replace a lost, stolen or destroyed bank check, provided you comply with our established procedures. If the original bank check is presented to us for payment before your claim becomes effective, we may pay the check, and we will not be liable to you for that item.

12

The amount of the stop payment request fee is disclosed in the Fees and Features guide. You agree to pay us a fee for every stop payment request we receive from you.

**19. Stale Checks.** Unless there is a valid stop payment request in effect, we may, in our sole discretion, pay or dishonor a check, other than a certified check, drawn on, and presented for payment against, your account if the check is presented more than 6 months after its date (that is, a stale check). We will make this decision without notice or liability to you.

**20. Postdated Checks.** Our check processing equipment is unable to detect postdated checks (that is, a check dated later than the date on which the check is written). Therefore, you agree not to write postdated checks on your account. You agree that we can assume that all checks presented against your account are payable on demand. We may pay and charge against your account a postdated check even though payment was made before the date of the check. We will not be liable to you for paying a postdated check drawn on your account before the stated date unless required by Applicable Law.

**21. Safeguarding Your Checks.** You agree to use care in safeguarding unsigned checks on your account against theft or misuse. You agree to tell us immediately if any such checks are lost, missing, destroyed or otherwise unaccounted for.

**22. Check Safekeeping/Check Imaging.** If we provide you with check imaging or check safekeeping services, we retain canceled checks and do not return them with your account statement. You agree that your cancelled checks may be destroyed after a reasonable period of time as determined by us in accordance with Applicable Law. You agree that by maintaining the original check or a substitute check (or image copies of them) on your behalf, we have made the check available to you in a reasonable manner. Copies of checks are available for 7 years from the date they are posted to your account. You may request a copy of any canceled check or substitute check, and a service charge may be imposed for each copy provided, as provided for in the Fees and Features guide. If for any reason we cannot return a copy of your check or satisfy your needs through other means, you agree that we will not be liable for more than the face amount of the check or your Losses, whichever is less.

**23. Copies.** At your request, we may provide you with copies of statements, checks, deposit and withdrawal slips or other account records and conduct research on your account. Fees for account research and the production of account records are set forth in the Fees and Features guide and are payable upon request of service at the teller window or may be deducted from your account without notice to you.

**24. Other Services.** We may from time to time offer other services which you may use in connection with your account, if you request them. You will be subject to all of the terms of the agreements governing any other available services which you choose, including any additional related fees and charges.

13

25. **Fees and Charges.** Your account may be subject to monthly maintenance and transaction fees and other miscellaneous charges. All account fees and charges are disclosed in the Fees and Features guide. You agree that we may automatically deduct any such fees and charges from your account without notice to you.

26. **Account Statements.** Your statement will be mailed monthly, quarterly or annually, depending on the type of account and services you have with us. We will not send your account statement to you if it is unclaimed or undeliverable because you provided us with inadequate delivery instructions, did not notify us in writing of a change in address, asked us to hold your account statement and did not claim it, or your account is inactive and deemed abandoned under Applicable Law or our procedures. In each of these cases, for all purposes it will be considered as if we had made your statement available to you as of the statement date that was or would have been printed on your statement. Unless Applicable Law provides otherwise, we may change the frequency of statements without providing notice to you of such change.

27. **Your Responsibility to Review Your Transactions.** You agree to carefully review your account statement and each transaction as soon as possible. If there are any errors or discrepancies, including without limitation, unauthorized transactions, signatures or alterations, you agree to promptly notify us of such errors or discrepancies within a reasonable time period, which will not be longer than 30 calendar days after we send you or otherwise make available to you your account statement, unless otherwise required by Applicable Law. Otherwise, we will consider the information contained in your account statement correct. Subject to Applicable Law, you may not make any claim against us for transactions reflected on a statement that you believe are incorrect, altered, forged, unauthorized, or improperly paid unless you notify us of that claim in writing within 30 calendar days after the statement was sent or made available to you. You can write to us at: Charter One, Customer Service Center, P.O. Box 42001, Providence, RI 02940-2001. You understand that we process checks by automated means and do not visually inspect all checks, and agree that we do not fail to exercise ordinary care by using automated means to process your checks. You further agree that we do not fail to exercise ordinary care if we pay a check that was altered or forged in such a manner that a reasonable person would not be able to detect the alteration or forgery.

28. **Change of Address.** We will rely on your address as it appears on our records for any and all communications we send to you unless you notify us in writing of a change of address at: Charter One, Customer Service Center, P.O. Box 42001, Providence, RI 02940-2001, and we have had a reasonable opportunity to act on such notice. You agree to notify us in writing if you change your address. You also agree that if the U.S. Postal Service or one of its agents notifies us of a change in address for you, we may change your address based on this information. We have no liability to you if we change your address based on such information, even if the information provided by the U.S. Postal Service or its agent is incorrect.

14

29. **Substitute Checks.** To make check processing faster, federal law permits banks to replace original checks with substitute checks. These checks are similar in size to original checks with a slightly reduced image of the front and back of the original check. The front of a substitute check states: "This is a legal copy of your check. You can use it the same way you would use the original check." You may use a substitute check as proof of payment just like the original check.

If you or a third party acting on your behalf creates a substitute check and the substitute check is deposited in your account, you represent and warrant to us that each such substitute check meets all of the requirements under Applicable Law, including Regulation CC. You agree to hold us harmless against any Losses arising from, or in any way related to, such substitute checks.

30. **Correspondence.** To the extent permitted under Applicable Law, any written correspondence you send to us will not be effective until received by us and we have had a reasonable opportunity to act on such correspondence. Any written correspondence we send to you will, however, be effective and deemed delivered when mailed to you at your address as it appears on our records.

If you have agreed to receive information or documents from us electronically (Electronic Records), the Electronic Records are sent by us, and received by you, when either (a) the Electronic Records are transmitted by us to an e-mail address you have given us for that purpose, or (b) the Electronic Records are posted to a website and an e-mail is transmitted by us to an email address you have given us for that purpose notifying you that the Electronic Records are available for access. If you have agreed to receive information or documents from us electronically, you will notify us immediately if your e-mail address changes or you cancel your e-mail service. Until you give us notice, we may continue to send Electronic Records to your e-mail address we have on file.

31. **Assignment, Pledge or Transfer of Your Account.** Your account is not negotiable and not transferable. Your savings account and CD account may be assigned or pledged by you only with our prior written consent (which we may withhold in our sole discretion) and upon receipt of any documentation we may require in a form satisfactory to us. We may, in our sole discretion, permit you to pledge your account as collateral for a loan made by us; however, you may not pledge your SEP or Qualified Plan account as collateral for any loan.

32. **Closing Your Account.** We may close your account at any time and for any reason and may or may not, in our sole discretion, provide notice to you of such closing. You may also close your account at any time by calling us or by visiting any of our branch offices. Any request to close your account will be effective only after we have received your request and we have had a reasonable opportunity to act on such request. If your account is closed, we may, in our sole discretion, mail to you at your address as it appears on our records a bank check representing the remaining balance

15

in your account, if any, or transfer such balance to another account you maintain with us. In any event, we will not be liable to you for dishonoring any item drawn on or debited from your account and presented to us for payment after your account has been closed. The closing of your account, whether by us or you, will not affect any of your or our rights and obligations which have arisen before the effective date of the closing of your account, and this Agreement will survive the closing of your account. In this regard, after your account is closed, you are still responsible for the payment of any fees or charges incurred prior to or in connection with the closing of your account.

33. **Abandoned Accounts.** If you do not notify us in writing of a change in your address at: Customer Service Center, P.O. Box 42001, Providence, RI 02940-2001, or if you do not use your account, your account may be presumed inactive or even abandoned after a certain period of time. Inactive accounts may be subject to service charges similar to those imposed on active accounts, and service charges may also be imposed on accounts presumed to be abandoned subject to Applicable Law. If your account is presumed to be abandoned, it will be turned over to the appropriate state in accordance with Applicable Law.

34. **Disputes.** Your account may become involved in an actual or potential claim, legal dispute, or legal process (for example; attachment, levy or garnishment) relating to your account (Dispute). In such instances, we may refuse to allow any Transactions on your account until the Dispute is released or we are notified by the proper persons or authorities that the Dispute has been resolved. You agree that we will not be liable to you for making a payment to any third party involved in a Dispute even if such payment leaves insufficient available funds in your account to cover any Transactions on your account. We will not contest a Dispute on your behalf, and we may take action to comply with a Dispute as we may determine to be appropriate under the circumstances without any liability to you. We will, to the extent required by Applicable Law, notify you in writing whenever we are notified of a Dispute and place such restrictions on your account. We may charge against or deduct from your account without prior notice to you, or otherwise bill you directly, an amount representing our expenses incurred in responding to or processing a Dispute, including, without limitation, attorneys' fees and litigation costs, as permitted by Applicable Law. In addition, you agree that we may assess and debit from your account any applicable fees set forth in the Fees and Features guide that may be assessed as a result of the Dispute in accordance with Applicable Law.

35. **Documentation as Evidence.** If we go to court for any reason, whether the proceeding is instituted by you, us or some other third party, we may introduce into evidence a copy, printout, microfilm, microfiche or electronic version of any document evidencing a transaction under this Agreement and such copy, printout, microfilm, microfiche or electronic version will be deemed as valid as the original document.

36. **No Waiver of Agreement.** No delay or waiver by us of any power, right, remedy or obligation under or in connection with this Agreement

16

on any one occasion will constitute a waiver of that power, right, remedy or obligation on any subsequent occasion. In any event, no such waiver or delay by us will be effective unless it is in writing and signed and approved by us.

37. **Enforceability of Agreement.** If there is a conflict between this Agreement and Applicable Law, despite anything in this Agreement that may state otherwise, this Agreement will be considered changed to the extent necessary to comply with the law. If any provision of this Agreement is deemed to be invalid, illegal or otherwise unenforceable in any respect by a court or other governmental agency having competent jurisdiction over us, that provision will continue to be enforceable to the extent permitted by that court or agency, and the remainder of that provision will no longer be considered part of this Agreement. All other provisions of this Agreement will, however, remain in full force and effect.

38. **Limited Liability.** Unless we have acted in bad faith or are otherwise prohibited by Applicable Law, we will not be liable to you for performing (or failing to perform) our services under or in connection with this Agreement. Without limiting the foregoing, we will not be liable for delays or mistakes which happen because of reasons beyond our control, including, without limitation, acts of civil, military or banking authorities, national emergencies, insurrection, war, riots, acts of terrorism, failure of transportation, communication or power supply, or malfunction of or unavoidable difficulties with our equipment.

If a court finds that we are liable to you because of what we did (or did not do, as the case may be) under or in connection with this Agreement, you may recover from us only your actual damages, in an amount not to exceed the total fees and charges paid by you to us under and in connection with this Agreement during the 6 month period immediately preceding the event giving rise to our liability. You agree that the dollar limitation described in the preceding sentence is reasonable, to the extent permitted by Applicable Law.

IN NO EVENT WILL YOU BE ABLE TO RECOVER FROM US ANY CONSEQUENTIAL, EXEMPLARY, INDIRECT OR PUNITIVE DAMAGES OR LOST PROFITS, EVEN IF YOU ADVISE US OF THE POSSIBILITY OF SUCH DAMAGES OR LOSSES.

39. **Indemnification of Charter One.** You agree to indemnify and hold us, our directors, officers, employees, and agents (and the same of our affiliates and our affiliates themselves) harmless from and against Losses arising in connection with the services provided under this Agreement, except for Losses arising out of our own gross negligence or willful misconduct. You further agree to hold us, our directors, officers, employees, and agents (and the same of our affiliates and our affiliates themselves) harmless from Losses arising out of actions taken or omitted in good faith by us in reliance upon instructions from you. We are not responsible for any actions or omissions by any third party. If you give us instructions that we believe may expose us to potential liability, we may

17

refuse to follow your instructions. We are under no obligation to follow, and we will not be liable to you if we choose not to follow, such instructions. If we do, we may ask you for certain protections such as a surety bond or an indemnity agreement in a form that is satisfactory to us.

40. **ACH Transactions.** You agree to adhere to the rules issued by the National Automated Clearing House Association governing electronic funds transfers processed through the Automated Clearing House network.

41. **Choice of Law.** Your account is governed by federal law and, to the extent not preempted by federal law, the law of the state where we open your account, or, if we transfer your account to another location, where we currently maintain your account (without regard to choice of law provisions).

42. **Changes to Agreement.** We may change any term or condition of this Agreement in our sole discretion and from time to time. Any such change will generally be effective immediately without notice to you unless we are required by Applicable Law to provide you with advance written notice of the proposed changes. In such instances, those changes will be effective immediately after we have provided you with the required advance written notice following the effective date stated in such notice. If any such required advance notice is returned to us as undeliverable because of a change in your address which you have not notified us about in writing or any other reason which is not our fault, the changes described in that notice are still binding on you. If you do not agree to the changes, you may terminate this Agreement in accordance with the terms of this Agreement. You will be deemed to accept any changes to this Agreement if you continue to maintain or use your account after the date on which the changes became effective. This Agreement may not be amended or modified orally.

43. **Your Instructions.** In our sole discretion, we may follow your instructions concerning your account, whether such instructions are provided by you in writing, electronically, orally (including our recording of your oral instructions) or by other means, and we may do so without any liability to you.

44. **Section Headings.** The headings in this Agreement are only for convenience and do not in any way limit or define your or our rights or obligations under this Agreement.

# C. BUSINESS ATM CARD AND BUSINESS DEBIT CARD TRANSACTIONS

1. **ATM Transactions.** You may access your account at any ATM displaying the NYCE®, Maestro®, Cirrus® or STAR℠ Program symbols using the debit card (Business Debit Card) or ATM card (Business ATM Card) and the

18

personal identification number (PIN) we issued to you. You may also use your Debit Card wherever MasterCard® Debit is accepted. When we use the word Card, we mean either your Business Debit Card or your Business ATM Card that we issued to you or any other person (Authorized Person) you authorize to use a Card, such as your employees and agents. You are responsible for all Card transactions conducted by any Authorized Person as if you had used the Card yourself. The transactions described in this Agreement that you may conduct with your Card may also be conducted by any Authorized Person unless you and we agree otherwise. Subject to certain limitations we may impose on you, you may use your Card to:

a. make deposits of cash or checks into your savings or checking account at any ATM that we own or operate that accepts deposits. You may not be able to make a deposit at an ATM that we do not own or operate;

b. withdraw funds from your savings or checking account at any ATM that we own or operate or any ATM in a network in which we participate;

c. transfer funds between your savings and checking accounts at any ATM that we own or operate that permits such transfers. ATMs that we do not own or operate may not permit you to transfer funds between your accounts. You may also transfer funds between your accounts by calling Charter One PhoneBank®, our automated telephone banking service;

d. check the balance of your savings and checking accounts at any ATM that we own or operate and any other ATM that will make this information available to you. You may also obtain this information by calling Charter One PhoneBank;

e. make payments on certain loans from us (including installment loans and lines of credit) at any ATM that we own or operate that accepts such payments by depositing a payment envelope in such ATM with cash, a check or a money order, or you can charge the payment to your checking or savings account; and

f. arrange to have preauthorized payments made from your checking or savings account.

2. **Business Debit Card Transactions.** In addition to the ATM transactions you can conduct using your Business Debit Card listed above in this Agreement, subject to certain limitations we may impose on you, you may also access your checking account with your Business Debit Card to purchase goods and services in person or by phone, mail or Internet, and get cash back from participating merchants and financial institutions.

3. **Ownership of Cards.** We own every Card we issue to you and any Authorized Person. You and any Authorized Person may not transfer such Cards to any other person. You and any Authorized Person agree to return Cards to us immediately upon our request. If this Agreement is terminated and you or any Authorized Person thereafter attempts to use a Card at an ATM, point-of-sale terminal or other approved electronic banking terminal or device, the Card may be retained. A Card may also be retained on the occurrence of certain other events. We have the right not to return

19

or issue a Card to you or any Authorized Person if a Card is used for an improper purpose by you or any Authorized Person. We also have the right to request the return of all Cards issued to you and any Authorized Person based on the improper use of a Card by you or any Authorized Person.

4. Using Cards. You must request a separate Card for each Authorized Person. Each Card and its corresponding PIN are to be used exclusively by the person to whom the Card is issued. Cards and their corresponding PINs are used by us to identify and authenticate you or the Authorized Person conducting the Card transaction. You authorize us to rely on a Card and its corresponding PIN to identify the user as you or an Authorized Person when a Card is used to perform a Card transaction requiring the use of a PIN. You also agree that we can rely on a Card and your or an Authorized Person's signature as authorization for any Card transaction performed.

The best way to minimize your potential losses and liabilities for unauthorized use of a Card is to safeguard each Card and keep each PIN confidential. Because this is so important, you agree to put in place security measures and take reasonable precautions to prevent unauthorized use of a Card. Further, you agree to ensure that each Authorized Person will put in place the same security measures and take the same reasonable precautions. You acknowledge and agree that, if you permit another person to use your Card or PIN or give any person your Card or PIN, you are responsible for any charges incurred by such person, even if that person exceeds your authorization. Examples of security measures and reasonable precautions include, but are not limited to, the following:

a. immediately signing the back of the Card when it is delivered to you;

b. ensuring the Card and its corresponding PIN are never stored in the same place;

c. never writing the PIN on the Card or on anything carried or stored along with the Card;

d. immediately memorizing the PIN when it is delivered to you and either destroying or keeping under lock and key the paper on which the PIN was delivered;

e. never disclosing the PIN to any other person, even another Authorized Person;

f. when any person ceases to be an Authorized Person, immediately reporting this event to us by calling 1-866-262-4249; and

g. as soon as you become aware or suspect that a Card is lost or stolen, immediately reporting this loss or theft (or suspected loss or theft) to us by calling 1-866-262-4249.

We employ security systems that may limit the use of your Card in circumstances where possible fraud or other problems are detected, particularly if your Card is used in a foreign country.

20

5. Foreign Transactions. Purchases and cash withdrawals made in a foreign country and in foreign currencies using your Card will be converted to U.S. dollars at the rate that exists on the date of exchange as determined by the foreign bank in accordance with applicable network operating rules or other applicable operating rules for international transactions. The conversion rate may not be the same as on the transaction date. We do not have any control over the exchange rate or the date or place of the exchange. We also do not have any control over any conversion fee that may be charged by a card association or network.

Your statement will detail your ATM and Debit Card transactions made outside of the United States as two separate items: the purchase or withdrawal amount and the Foreign Currency Fee amount. The Foreign Currency Fee amount consists of a 2% Foreign Currency Fee of any Debit Card purchase amount, non-PIN purchase amount and withdrawal amount and any related network fees that may apply.

6. Your Liability. If a Card or a Card number is lost or stolen, we will not hold you responsible for its unauthorized use if you notify us promptly at 1-866-262-4249.

You agree, however, that you will not claim use of a Card was unauthorized if the use arose as a result of your negligence or the negligence of an Authorized Person. You agree that your failure, or the failure of an Authorized Person, to put in place and follow all appropriate security measures and reasonable precautions, including, but not limited to, those listed above in the Using Cards section, will be deemed negligence by you or that Authorized Person. You further agree that notifying us promptly means that you or an Authorized Person has notified us within the sooner of (a) two business days after you or the Authorized Person discovered or should have discovered the loss or theft of the Card or PIN, or (b) 30 calendar days from when we made available to you a statement showing the first unauthorized use. We may require you to provide us with an affidavit setting out the details of your claim and your observance of proper security measures and reasonable precautions. All Card transactions are debit transfers and therefore are not and will not be treated as a payment order for purposes of Article 4A of the Uniform Commercial Code.

## D. FUNDS AVAILABILITY DISCLOSURE

1. Your Ability to Withdraw Funds. Our general policy is to make funds from your cash and check deposits available to you on the first business day after we receive your deposit. The remainder of your deposits may be available on the next business day. Electronic direct deposits and cash deposits made in person will be available on the day we receive the deposit. Once the funds are available, you can withdraw them in cash and we will use the funds to pay checks that you have written on your account and other withdrawals or debits that you have authorized or made from your account.

21

Please remember that even after we have made funds available to you, and you have withdrawn the funds, you are still responsible for checks that you deposit that are returned to us unpaid and, subject to Applicable Law, for any other problems involving your deposit.

If you make a deposit in person to one of our employees at one of our branch offices before 2:00 p.m. (or 3:00 p.m. Eastern Time at one of our ATMs) on a business day that we are open, we will consider that day to be the day of your deposit. However, if you make a deposit in person to one of our employees at one of our branch offices after 2:00 p.m. (or 3:00 p.m. Eastern Time at one of our ATMs) or on a day we are not open, we will consider that the deposit was made on the next business day we are open. The 2:00 p.m. cutoff time may be later on some days or at some of our branch offices. Each of our branch offices posts the cutoff time applicable to that location or particular days.

If we cash a check for you that is drawn on another bank, we may withhold the availability of a corresponding amount of funds that are already in your account. Those funds will be available at the time funds from the check we cashed would have been available if you had deposited it.

If we accept for deposit a check that is drawn on another bank, we may make funds from the deposit available for withdrawal immediately but delay your availability to withdraw a corresponding amount of funds that you have on deposit in another account with us. The funds in the other account would then not be available for withdrawal until the applicable time periods that are described elsewhere in this disclosure for the type of check that you deposited.

2. **Longer Delays May Apply.** In some cases, we will not make all of the funds that you deposit by check available to you on the first business day after the day of your deposit. Depending on the type of check that you deposit, funds may not be available until the fifth business day after the day of your deposit. The first $100 of your deposits, however, may be available on the first business day.

If we are not going to make all of the funds from your deposit available on the first business day, we will notify you at the time you make your deposit. We will also tell you when the funds will be available. If your deposit is not made directly to one of our employees, or if we decide to take this action after you have left the premises, we will mail you the notice by the business day after we receive your deposit.

If you will need the funds from a deposit right away, you should ask us when the funds will be available. In addition, funds you deposit by check may be delayed for a longer period under the following circumstances:

- We believe a check you deposit will not be paid.
- You deposit checks totaling more than $5,000 on any one day.
- You redeposit a check that has been returned unpaid.
- You have overdrawn your account repeatedly in the last 6 months.

22

- There is an emergency, such as failure of computer or communications equipment.
- If a check is drawn on a bank outside of the United States, it may be sent for collection instead of being deposited into your account. Funds will be available after we receive payment of the check from the bank on which it is drawn.

We will notify you if we delay your ability to withdraw funds for any of these reasons, and we will tell you when the funds will be available. They will generally be available no later than the ninth business day after the day of your deposit.

3. **Special Rules for New Accounts.** If you are a new customer, the following special rules will apply during the first 25 days your account is open. If the 25th day does not fall on a business day, these special rules will apply through the first business day after the 25th day.

We may make the first $100 of your total deposits of items drawn on another bank available to you on the business day of your deposit.

Funds from electronic direct deposits to your account, wire transfers and cash deposits made in person to one of our employees will be available on the day we receive the deposit. Funds from deposits of cash and the first $5,000 of a day's total deposits of cashier's, certified, teller's, travelers, and federal, state and local government checks will be available on the first business day after the day of your deposit if the deposit meets certain conditions. For example, the checks must be payable to you (and you may have to use a special deposit slip). The excess over $5,000 will be available on the fifth business day after the day of your deposit. If your deposit of these checks (other than a U.S. Treasury check) is not made in person to one of our employees, the first $5,000 will not be available until the second business day after the day of your deposit.

Funds from deposits of checks drawn on any subsidiary bank of Citizens Financial Group, Inc. will be available on the second business day after the day of your deposit.

Funds from all other check deposits will be available on the fifth business day after the day of your deposit.

23

24

